Minute Order Form (rev. 12/90)

## UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | ROBERT W. GETTLEMAN | Sitting Judge if Other Than Assigned Judge | |
|---|---|---|---|
| Case Number | 99 C 290 | Date | May 11, 2001 |
| Case Title | Harriet G. Woodward  v  Alan Myres, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [use listing in "MOTION" box above]
(2) ☐ Brief in support of motion due _____
(3) ☐ Answer brief to motion due _____ Reply to answer brief due _____
(4) ☐ Ruling / Hearing on _____ set for _____ at _____
(5) ☐ Status hearing ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____
(6) ☐ Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____
(7) ☐ Trial ☐ Set for ☐ re-set for _____ at _____
(8) ☐ ☐ Bench Trial ☐ Jury Trial ☐ Hearing held and continued to _____ at _____
(9) ☐ This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to
    ☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)

(10) ☒ [Other docket entry] Memorandum opinion and order entered. Accordingly, defendants' motion for summary judgment on counts IV and VI of plaintiff's complaint is denied.

(11) ☒ [For further detail see ☐ order on the reverse of ☒ order attached to the original minute order form.]

| | No notices required, advised in open court. | | number of notices | |
|---|---|---|---|---|
| | No notices required. | FD-7 FILED FOR DOCKETING | | Document # |
| ☒ | Notices mailed by judge's staff. | 01 MAY 11 PM 3:34 | MAY 14 2001 date docketed | 69 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing dpty. initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate Judge. | | date mailed notice | |
| GJ courtroom deputy's Initials | | Date/time received in central Clerk's Office | mailing dpty. initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HARRIET G. WOODWARD, Special Administrator of the Estate of JUSTIN FARVER, deceased,<br><br>Plaintiff,<br><br>v.<br><br>ALAN MYRES, KAREN DEAN, R.N., and CORRECTIONAL MEDICAL SERVICES OF ILLINOIS, INC.,<br><br>Defendants. | No. 99 C 0290<br><br>Judge Robert W. Gettleman<br><br>**DOCKETED**<br><br>MAY 1 4 2001 |

## MEMORANDUM OPINION AND ORDER

This action stems from the October 13, 1998, suicide of Justin Farver ("Farver"), a pre-trial detainee at the Lake County Jail ("the jail"). Plaintiff, Harriet G. Woodward, administrator of Farver's estate, has filed a six count third amended complaint against defendants Alan Myres ("Officer Myres"), Karen Dean, R.N. ("Nurse Dean"), and their employer, Correctional Medical Services of Illinois, Inc. ("CMS"), an entity paid to provide all necessary medical and psychological services at the jail. Counts IV and VI allege that CMS and Nurse Dean deprived Farver of his Due Process rights guaranteed by the Fourteenth Amendment[1] to the United States

---

[1] Plaintiff also asserts that defendants violated Farver's Eighth Amendment rights. The Eighth Amendment protection against cruel and unusual punishment does not apply to pretrial detainees, however. "A pretrial detainee has not been found guilty of a crime and therefore may not be 'punished' by the state." Payne v. Churchich, 161 F.3d 1030, 1040 (7th Cir. 1998) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)); see also Tesch v. County of Green Lake, 157 F.3d 465, 472 (7th Cir. 1998). Instead, Farver is protected from prison officials' deliberate indifference to his medical needs under the Due Process Clause of the Fourteenth Amendment. Payne, 161 F.3d at 1040. This protection is "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983); Tesch, 157 F.3d at 473.

Constitution. Defendants now seek summary judgment on those two claims. For the reasons set forth below, defendants' motion is denied.

## FACTS[2]

Farver was twenty-three years old in the fall of 1998. Farver, who was afflicted with cerebral palsy, had finished one year of college and was living with and helping his brother and sister-in-law raise their six children in Zion, Illinois. On September 24, 1998, Farver was arrested on a seven count felony indictment alleging that Farver attempted to rape his twelve year-old niece at knife-point. Farver was taken to the jail and was evaluated by Nurse Dean, who, at that time, had been a registered nurse for approximately two years and had conducted 30 to 40 similar evaluations. Nurse Dean's evaluation consisted of a medical history, a medical screening, and a mental health screening.

Through her evaluation, Nurse Dean learned about Farver's cerebral palsy and also that he had attempted suicide in 1995 by trying to jump in front of a train and was later hospitalized for psychiatric problems, and that he received outpatient mental health treatment at Dixon Correctional Center in May, 1998. Nurse Dean also learned that Farver was worried about major problems other than his legal situation (she says he said that he was "always worried"), that one of Farver's parents had attempted to commit suicide, and that Farver had a history of violent behavior. In addition to noting this information on Farver's CMS Mental Health Screening form, Nurse Dean circled "Yes" in box number eight, which asked whether Farver "Expresses thoughts

---

[2] Plaintiff and defendants attempt to support some of their assertions of fact by citing to a "Summary of Events" prepared by defendants' attorneys. The summary is not sworn testimony and, therefore, the assertions that it purports to support are disregarded by the court. See Fed. R. Civ. P. 56(e).

2

about killing self."

According to the form, because question eight was answered affirmatively, Nurse Dean was to "alert Shift Commander and refer [Farver] for Mental Health Evaluation." Nurse Dean did not do that, however, because, according to her deposition testimony, she checked the box in reference to Farver's past thoughts of suicide. Even so, Nurse Dean also said that she did not tell the shift commander about Farver's suicide risk because, as she put it:

> ANSWER: I wasn't concerned. There was [sic] no trains. If that's his mode of killing himself, he wasn't going to find one in the jail. It seemed very irrelevant at the time, okay? And indeed it was.
>
> QUESTION: Why do you say that?
>
> ANSWER: He was not suicidal when we spoke. He wasn't suicidal when I spoke to him. It was many, many, many days later [that he committed suicide] and [after our meeting] he was . . . seen by other people and evaluated, so he was going to medical,[3] where he would have proper attention.

Nurse Dean also says that she asked Farver if he had any current thoughts of killing himself, and he responded, "No."[4] Thus, when Nurse Dean finished her evaluation of Farver and the shift

---

[3] Nurse Dean is referring to the medical unit in the jail, which is separate from the general population. The state court judge who arraigned Farver had issued an order on or before November 24, 1998, directing Farver to be housed in the medical pod because of his cerebral palsy.

[4] Plaintiff asserts that Farver's alleged statement cannot be used by defendants because it is barred by the Illinois Dead-Man's Act. See 735 ILCS 5/8-201. In response, defendants argue that it is federal law, not Illinois law, that "provides the rule of decision" in the instant case, making the Dead-Man's Act inapplicable. See Donohoe v. Consolidated Operating & Production Corp., 736 F. Supp. 845, 860 (N.D. Ill. 1990) ("[W]here a federal claim is at issue the Dead-Man's Act is inapplicable."). While that may be true with regard to the counts at issue in the instant motion (and one additional count), it is not the case for plaintiff's three Illinois Wrongful Death claims. Even so, the issue is easily resolved.

The Dead-Man's Act provides that, "no adverse party or person directly interested in the

3

commander asked if Farver was "going to medical," Nurse Dean responded affirmatively without further comment.

Nurse Dean also failed to fill out the "Summary" and "Disposition"[5] sections on mental health intake screening form, which would have indicated her overall findings regarding Farver's mental health, as well as her recommendation for his future psychological treatment. As a result, Farver was not referred for mental health treatment of any kind by Nurse Dean. Additionally, although the mental health screening form includes a "Reviewed by" signature line, that line is

---

action shall be allowed to testify on his or her own behalf to any conversation with the deceased . . . or to any event which took place in the presence of the deceased." See 735 ILCS 5/8-201. One exception to this rule, however, is that if a person testifies on behalf of the deceased's representative to a particular conversation or event, then an adverse party or interested person may testify to that same conversation or event. See 735 ILCS 5/8-201(a). This exception appears to apply to Nurse Dean's evaluation of Farver; plaintiff repeatedly refers to the mental health screening form Nurse Dean filled out and argues that, based on what she learned during that evaluation, Nurse Dean was deliberately indifferent in not informing the shift commander that Farver was suicidal and in not referring Farver for mental health treatment as soon as possible. Thus, so long as plaintiff uses the form (which records the simultaneous conversation between Farver and Nurse Dean) to prove deliberate indifference, Nurse Dean is not barred by the Dead-Man's Act from testifying about what she contends Farver said during the evaluation.

[5] The "Summary" portion of the form allows the writer to choose from the following options in rating the detainee: "(1) No mental health problems; (2) Mental health problems requiring routine follow-up; (3) Chronic mental health problem—(a) Mental Illness; (b) Developmental Disability; or (c) Other; (4) Acute mental health problem—(a) Psychosis; (b) Suicidal; or (c) Other; (5) Potential withdrawal from substance abuse." Similarly, the "Disposition" portion of the form gives the writer the following options: (1) Approved for General Population: "No Mental Health Referral; (2) Approved for General Population: Routine Mental Health Referral; (3) Special Housing: Mental Health Referral ASAP; (4) Suicide Precaution Procedures: Mental Health Referral ASAP; (5) Psychiatric Referral; (6) Medical Monitoring for Potential Withdrawal." (Numbering supplied for clarity; the actual form has blank lines for the writer to mark with an "X" or check.)

4

left blank on Farver's form, indicating that it was not reviewed by Nurse Dean's supervisor.[6] Thus, although Farver was housed in the medical pod thereafter, he was not placed on suicide watch[7] and he did not receive a further mental health examination until seven days later, when he was evaluated by Joel Mollner ("Mollner"), the jail's licensed clinical social worker.

During his evaluation of Farver on October 1, 1998, Mollner filled out a form called a Mental Health Intake Evaluation form, on which he wrote much of the same information Nurse Dean noted on her form previously. The form notes that Farver had a psychiatric history for approximately ten years, and that his most recent inpatient care was in 1995, following his attempted suicide by "playing on train-tracks." The form further notes that Farver was not currently receiving psychotropic medication and that, although he was considered by Mollner to be "coherent, oriented, and rational," he felt, "anxious, depressed, [] and not himself." In response to the question, "History of suicidal ideation or behavior?" Mollner circled "Yes," and added the following:

> Over 10 self-destructive episodes. Most recent, 1995. Feels current suicidal proclivities as he knows what he did was wrong [and he is] not looking to spend rest of his life in prison. Over 10 psychiatric hospitalizations, most recent 4/95, for suicide attempt. Single, no children. Employed in child care [and] has cerebral palsy. Felt anxious.

---

[6] Defendants' assertion that review of the form by a supervisor was "not required" is unsupported by the record and therefore disregarded by the court.

[7] Although inmates in the medical pod receive 24-hour observation by correctional officers, inmates on suicide watch were individually checked every fifteen minutes. Defendants point out that although Farver was never placed on suicide watch, his cell was between the cells of two inmates who were on suicide watch. Further, defendants contend that Farver's cell was situated in such a way that the correctional officer assigned to the medical pod could see into it at all times. It is unclear, however, whether the jail staff could see into Farver's entire cell and whether and how often they made the effort to do so.

5

In response to "treatment plan," Mollner wrote: "depressed, angry." Mollner referred Farver to the jail psychiatrist, Dr. Michael Fernando ("Dr. Fernando"). Mollner did not request that Farver be placed on suicide watch.

Farver was seen by Dr. Fernando on October 11, 1998. Dr. Fernando filled out a Psychiatric Evaluation form for Farver. In response to "presenting problem," Dr. Fernando wrote that he was "requested to see [Farver because] of recent suicidal thinking in context of past attempts and mult[iple] psych[iatric] hospitalizations." Dr. Fernando also wrote that Farver "reports multiple [inpatient] psychiatric hos[pitalizations] for suicide attempts including [an overdose] on pills, cutting wrists, running in front of a train." In addition, Dr. Fernando wrote that Farver, "feels hopeless, helpless, worthless" and noted that Farver was suicidal. As a result, Dr. Fernando diagnosed Farver as having a major depressive disorder and prescribed Farver an antidepressant and a tranquilizer. Dr. Fernando did not order that Farver be placed on suicide watch.

In the meantime, shortly after Farver was admitted to the jail and up to October 12, 1998, Farver made multiple attempts to contact his niece (the young woman he allegedly attempted to rape at knife-point). According to a statement by one of Farver's fellow inmates submitted by defendants, Farver spent the better part of the day on October 12, 1998, laying in bed but he came out to use the phone very abruptly two times that evening.[8] Apparently, Farver had called his brother, who refused to take his call and refused to allow Farver to speak to his niece. The jail staff was notified of Farver's phone call and he was placed on "lockdown" (i.e., he was not

---

[8] The same inmate says that the deputy on duty did not check on Farver frequently on October 12, 1998, even though Farver "was very distraut [sic] and out of it" that day.

6

allowed to leave his cell for any reason) as a result. The next morning, the same inmate heard a deputy tell Farver that he was warned enough and that this time his lockdown period would be indefinite.[9] That same inmate saw Farver "pacing and staring at the hooks" on the wall of his cell (presumably intended for the hanging of hand towels) between 11:00a.m. and noon later that day. At 12:51p.m. that afternoon, Officer Myers entered the medical pod to assist an inmate to his cell following a visit to court. According to Officer Myers, at that time Farver was lying in his bed beneath his blankets, moving around a little. Approximately nine minutes later, Officer Myers was alerted by another inmate that Farver had hanged himself. Although Officer Myers and others attempted to revive Farver, he was pronounced dead on arrival at the local hospital.

Officer Myers testified that Farver was a "happy-go-lucky" guy who never appeared suicidal or behaved strangely. Farver's brother, who spoke to Farver on the phone soon after he was admitted to the jail, also testified that his brother did not seem depressed or suicidal when they spoke.

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and

---

[9] Officer Myers confirms that he spoke to Farver about the duration of his lockdown. Officer Myers says he told Farver simply that the log book said "until further notice" regarding his lockdown duration.

7

set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. As always, the court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

## DISCUSSION

Defendants make three arguments in urging the court to grant summary judgment: (1) that plaintiff's evidence supports only a medical malpractice action and is insufficient to support a claim under §1983; (2) that there is no evidence that on September 24, 1998, Nurse Dean was aware that Farver would eventually commit suicide; and (3) that there is no evidence of a CMS policy causing Farver's suicide. The court will address these arguments in turn, beginning with the first two.

### I. Count VI–Plaintiff's §1983 claim against Nurse Dean

Defendants first argue that plaintiff has not supported the §1983 claim with regard to Nurse Dean; according to defendants, the instant suit is nothing more than a medical malpractice case. Defendants further urge that there is no evidence that Nurse Dean was aware of Farver's suicidal tendencies when she evaluated him. Plaintiff responds that the question of whether Nurse Dean was deliberately indifferent is a question of fact for the jury to decide. Plaintiff

8

maintains that sufficient evidence has been produced for a reasonable jury to find deliberate indifference; that enough evidence has been presented to lead a jury to reasonably conclude that Nurse Dean knew about and deliberately disregarded Farver's need for mental health care.

Proof of ordinary medical malpractice or negligence is insufficient in §1983 claims. See Sellers v. Henman, 41 F.3d 1100, 1102-03 (7th Cir. 1994). To prevail, plaintiff must prove that Nurse Dean acted or failed to act despite knowledge of a substantial risk. Farmer v. Brennan, 511 U.S. 825, 842 (1994). "Suicide is a 'serious harm' and prison officials must take reasonable preventative steps when they are aware that there is a substantial risk that a[ pretrial detainee] may attempt to take his own life." Estate of Novack v. County of Wood, 226 F.3d 525, 525 (7th Cir. 2000). "[S]ubjective recklessness as used in the criminal law is . . . [the appropriate] test for 'deliberate indifference'" Farmer, 511 U.S. at 839. Plaintiff need not present evidence of Nurse Dean's knowledge that a substantial risk of suicide existed, though; a jury could make that inference based solely on a finding that the risk was obvious. See id. at 842 ("Whether a prison official had the requisite knowledge . . . is a question of fact subject to demonstration in the usual ways . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). Thus, at this stage of the litigation, plaintiff need only produce enough evidence upon which a reasonable jury could base a finding that the risk that Farver would commit suicide was obvious, and yet Nurse Dean did nothing to prevent that harm.

The court finds that plaintiff has met this requirement. To begin, there is a genuine issue of material fact as to whether Nurse Dean knew that Farver's mental state posed a substantial risk to his safety. Nurse Dean maintains that she circled "Yes" to "Expresses thoughts about killing self?" in response to Farver's past suicide attempts, and that when she asked Farver whether he

9

had any current thoughts of taking his life, he responded negatively. Nurse Dean's testimony is not dispositive, however. The jury may not believe Nurse Dean. After all, the form posed a simple question in present tense, and Nurse Dean made no effort on the form to modify the response she gave to that question to indicate that it referred to past events.[10] Additionally, there is some indication from her testimony that Nurse Dean might have recklessly discounted Farver's suicidal proclivity based on the fact that "there was [sic] no trains" in the jail, making his thoughts of suicide "irrelevant" in her estimation.

Further, regardless of what Nurse Dean says on the stand, a jury could also reasonably find that, based on what Nurse Dean learned during her evaluation of Farver, the risk of him committing suicide was obvious. Nurse Dean knew that Farver suffered from cerebral palsy, she knew that he was "always worried," she knew that he had a history of psychiatric treatment (including proscribed medications), she knew that had attempted suicide, and she knew that one of his parents had also attempted suicide. A reasonable jury could conclude that, based on all of these facts, the risk of Farver committing suicide was obvious on September 24, 1998.

Defendants argue that Nurse Dean should be released from liability under §1983 because Farver did not commit suicide until 19 days after he met with Nurse Dean,[11] Farver was to be

---

[10] Nurse Dean made modifications to her responses to other questions. To question four, "Worried about major problems other than legal situation (terminal illness)," Nurse Dean wrote that Farver is "always worried." Likewise, Nurse Dean circled the word "parent" in question five, which read, "Family member or significant other has attempted or committed suicide (spouse, parent, sibling, close friend, lover)."

[11] Defendants argue that, "Nurse Dean's conclusion that [Farver] was not suicidal on September 24, 1998[,] was, in hindsight, correct." The court is unimpressed with this argument. The question with regard to Count VI is whether Farver was at a substantial risk of committing suicide on September 24, 1998. The fact that Farver waited 20 days to hang himself changes

10

housed in the medical pod where he would be constantly monitored and he would eventually receive a mental health evaluation, and because Farver was seen subsequently by Mollner and Dr. Fernando. But what if Farver had not waited until October 13, 1998, to hang himself? What if he had hanged himself on September 25, 1998, or on September 26, 1998, or on any of the seven days before Mollner got around to seeing Farver? The fact of the matter is that Nurse Dean failed to notify the shift commander as directed by the form she filled out during her examination of Farver, she failed to summarize or recommend a disposition on that form, and she failed to have that form reviewed by her supervisor. Consequently, Farver was not placed on suicide watch, he was not given an immediate mental health screening, and he was not placed on an immediate treatment program. The court agrees with plaintiff that even though, in retrospect, Nurse Dean's failures may appear to be diluted by the intervening days or events prior to Farver's suicide, a reasonable jury could still find that Nurse Dean acted with deliberate indifference to the known or obvious substantial risk that Farver would take his own life.

Defendants also argue that Nurse Dean's decisions not to alert the shift commander and not to refer Farver for immediate medical treatment constitute professional medical judgments, and that "mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not rise to the level of deliberate indifference." See Sellers v. Henman, 41 F.3d 1100, 1102 (7th Cir. 1994); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261–62 (7th Cir. 1996). While it may be true that mere differences of opinion do not rise to the level of deliberate indifference, the Seventh Circuit has explained that:

---

nothing about the facts Nurse Dean had at her disposal at the time she evaluated him.

11

> [D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision . . . when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.

Id. Assuming that Nurse Dean's decisions can be classified as "treatment decisions" (they are more aptly described as decisions not to treat), the court finds that it need only look to the form she filled out to determine whether her decisions were a substantial departure from accepted professional judgment, practice, or standards. The form required Nurse Dean to notify the shift commander if question eight is answered "Yes"; yet Nurse Dean only confirmed the obvious to the shift commander, that Farver was to be taken to the medical unit as ordered by the judge. The form has "Summary" and "Disposition" sections for conclusions about the inmate's mental health and future treatment; yet Nurse Dean decided not to fill in those sections with regard to Farver. The form has a place for Nurse Dean's supervisor to sign, indicating that the form was reviewed; yet that signature line is conspicuously blank. Thus, the court finds that plaintiff has presented sufficient evidence upon which a reasonable jury could conclude that Nurse Dean's decisions were a substantial departure from accepted professional judgment, practice, or standards.

Next, defendants argue that Nurse Dean did not act with deliberate indifference because she had no knowledge of Farver acting in a "freaky" or violent manner.[12] Defendants cite no

---

[12] Similarly, defendants assert that, "[t]here is simply no evidence, from any source, to suggest that [Farver] was ever 'acutely suicidal' prior to October 13, 1998." (This obviously ignores Farver's previous suicide attempt in 1995.) Defendants accept the definition of "acutely suicidal" given by plaintiff's expert, Dr. Griefinger, which defines the term to mean that, "someone is thinking about either killing themselves or putting themselves in danger at the current time." The court finds that there is a genuine issue of material fact as to whether and

12

cases stating that Farver must act in a "freaky" or violent manner before he can be considered a suicide risk, however. Instead, one of the cases defendants cite to support this argument, State Bank of St. Charles v. Camic, 712 F.2d 1140 (7th Cir. 1983), held that the fact that an inmate acts in a "freaky" or violent manner is alone insufficient to alert prison staff that the inmate is suicidal. 712 F.2d at 1146 ("Knowing that [the inmate] was behaving violently, or was acting in a 'freaky' manner is not synonymous with having reason to know that the violence might become self-directed."). In State Bank of St. Charles, the inmate was intoxicated when arrested, uncooperative during the booking procedure, and behaving in a "freaky" manner approximately an hour before hanging himself—but, unlike the instant case, the defendants had no knowledge of any past psychiatric treatment or medication taken by the inmate, much less any past suicide attempt on his part. See id. at 1042-44. Thus, even though Nurse Dean may not have seen Farver acting in a "freaky" or violent manner, the information she did know is the sort of information that is synonymous with having reason to know that Farver faced a significant risk of committing suicide.

Finally, defendants contend that Nurse Dean took reasonable steps to prevent Farver's

---

when Farver was acutely suicidal. On the one hand, Nurse Dean, Officer Myers and Farver's brother testified that they did not believe Farver was suicidal when they interacted with him. On the other hand, Nurse Dean did respond affirmatively that Farver "Expresses thoughts about killing self." Also, Mollner wrote that Farver "[f]eels current suicidal proclivities as he knows what he did was wrong [and he is] not looking to spend rest of his life in prison," in addition to noting that Farver felt, "anxious, depressed, [] and not himself," as well as "angry." Likewise, Dr. Fernando wrote that he was "requested to see [Farver because] of recent suicidal thinking in context of past attempts and mult[iple] psych[iatric] hospitalizations," and also that Farver "feels hopeless, helpless, worthless" and was suicidal. Thus, even though Nurse Dean, Officer Myers and Farver's brother assert that they did not believe Farver was suicidal, a reasonable jury could still determine that Farver was indeed "thinking about either killing [himself] or putting [himself] in danger" on and for the 19 days after September 24, 1998.

13

death. To support this argument defendants point to the fact that Farver was housed in the medical unit, he was examined by Mollner on October 1, 1998, and he was also examined by Dr. Fernando on October 11, 1998. These facts are undisputed, of course, but it is also undisputed that they did not result from any action taken by Nurse Dean. In fact, it was a court order that required Farver to be housed in the medical pod, and it was his mere presence there that led to his eventual evaluation by Mollner, who later referred Farver to Dr. Fernando. Nurse Dean cannot now take credit for a decision and ensuing events that were beyond her control.

In conclusion, the court finds that there is a genuine issue of material fact as to whether Nurse Dean acted with deliberate indifference. Therefore, defendants' motion for summary judgment of Count VI is denied.

## II. Count IV–Plaintiff's §1983 claim against CMS

The Seventh Circuit explained in Estate of Novack, 226 F.3d at 530-31, that there are two ways for a plaintiff to establish municipal liability[13] under §1983. First, there is the direct method, which requires the plaintiff to show that the municipality's "policy or practice is the 'direct cause' or 'moving force' behind the constitutional violation." Id. at 530 (quoting Monell v. Department of Soc. Svcs., 436 U.S. 658, 694 (1978)). Second, there is the indirect method, which requires showing "'a series of bad acts and inviting the court to infer from them that the policymaking level of [the entity] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate [employees].'" Estate of Novack, 226 F.3d at 531 (quoting Jackson v.

---

[13] CMS agrees with plaintiff that its potential liability under Count IV is equivalent to that of a municipality under §1983 caselaw.

14

Marion County, 66 F.3d 151, 152 (7th Cir. 1995)).

Defendants argue that plaintiffs cannot establish liability via the direct method because "plaintiff has no evidence of any unconstitutional policy or practice existing at the jail." . Defendants are correct, in part. Neither plaintiff nor defendants have provided the court with a statement or evidence of CMS's policies.[14] All hope is not lost for plaintiff, however. Although the court cannot determine whether an official CMS policy is unconstitutional without evidence of that policy, the court can consider whether a CMS procedure, as evidenced by a pattern of conduct over a period of time, was the "direct cause" or "moving force" behind a constitutional violation in the instant case.

---

[14] It goes without saying that the court cannot determine whether a CMS policy is unconstitutional unless the court is aware of that policy. The only evidence of a policy in the record is the supervisor's signature line indicating a requirement for approval at the bottom of the form Nurse Dean filled out on September 24, 1998—and Dr. Griefinger testified that he believes that form complies with the industry standard of care. Of course, defendants deny that such a requirement exists under CMS policy, though they fail to back up that assertion. Plaintiff responds that CMS did not produce a statement of its policies during discovery. The court's job is not to micro-manage the discovery process (especially now that that process has ended). If a statement of CMS's relevant policies exists and plaintiff thought it was relevant, plaintiff should have requested the information in discovery and filed a motion to compel if it was not forthcoming. Likewise, defendants must support their assertions of what is or is not a requirement under CMS policy. Instead, both parties tap dance around the issue, leaving the record incomplete.

Plaintiff attempts to get around this fact by arguing that CMS's "practice of employing untrained and unqualified nursing personnel" is exhibited through Nurse Dean's substandard training and qualifications, and that CMS's policy of not having sufficient supervision of its personnel is exhibited by the fact that Nurse Dean's supervisor did not review the form she filled out on September 24, 1998. It is well established, however, that single instances of such conduct (one example of a poorly trained employee and one example of a failure to supervise) do not establish a Monell claim. See Canton v. Harris, 489 U.S. 378, 309 (1989). Thus, the court cannot make any finding with regard to plaintiff's theory of direct liability on CMS's policies, nor defendants' purported defense to that theory.

15

Plaintiff argues that defendants sanctioned "an environment of substandard care" at the jail—care which amounted to deliberate indifference. Defendants cringe at this suggestion, emphasizing that during his 19 day stay at the jail, Farver's mental health was assessed by a nurse, a social worker, and a psychiatrist, and he was housed in the medical pod where they say he received 24-hour supervision. The problem with defendants' argument is that it is a double-edged sword. The same argument also shows that within a 19 day period, a nurse, a social worker and a psychiatrist at the jail all met with Farver and all documented the substantial risk of suicide he faced. And despite that documentation, Farver was never placed on suicide watch, he was never placed in a padded cell or a room without hooks on the wall, and, perhaps most importantly, the deputies monitoring the medical unit were never informed of his proclivity to commit suicide.

Monell teaches that, "it is when execution of [an entity's] . . . custom . . . inflicts the injury that the [entity] . . . is responsible under §1983." 436 U.S. at 694. The question becomes, then, whether a reasonable jury could find that it was CMS's custom of repeatedly failing to act to ensure Farver's safety that led to his successful attempt to commit suicide. The facts in the instant case answer that question affirmatively. The day before he committed suicide, Farver was observed to be distraught and he was allowed to lie in bed most of the day. Farver also had access to a telephone in the pod, which he used to abruptly attempt to contact his niece twice that day. Farver's brother refused to take Farver's call, however, and Farver was placed on lockdown. The next morning, Farver asked Officer Myers when he would be taken off lockdown, and Officer Myers answered either that the log said "until further notice" or that Farver would be on lockdown "indefinitely." Approximately four hours later, Farver was seen

16

by a fellow inmate pacing in his room and staring at the hooks on his wall. Between one and two hours later, Farver wrapped a sheet around his neck and hanged himself using those hooks.

The court believes that a reasonable jury could conclude that, were it not for CMS's custom of failing to inform the jail staff about Farver's suicidal condition, Farver would not have been allowed to lie in bed all day unchecked, he would not have been granted access to the telephone, he would not have been placed on lockdown, Myers would not have answered Farver's question the way he did, or Farver would have been moved to a padded room or a room without hooks on the wall—and that any one of these differences in the events that occurred during Farver's incarceration would have saved his life. Thus, the court denies defendants' motion for summary judgment of Count IV.

## CONCLUSION

Defendants' motion for summary judgment of Counts IV and VI of plaintiff's complaint is denied.

**ENTER:** May 11, 2001

Robert W. Gettleman
United States District Judge